(87 Misc. Rep. 242)

## In re MESA'S ESTATE.

### (Surrogate's Court, New York County. October 27, 1914.)

1. DOMICILE (§ 4*)—"DOMICILE OF CHOICE"—"DOMICILE."

    A "domicile of choice" consists of more than intention. It may, if actual, be superseded by another domicile of choice, or the domicile of origin may prevail, if doubt exists as to the last domicile of choice; but "domicile" and "residence" are not always convertible terms.

    [Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 5–23; Dec. Dig. § 4.*

    For other definitions see Words and Phrases, Second Series, Domicile of Choice; also First and Second Series, Domicile.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. DOMICILE (§ 10\*)—CITIZENSHIP—NATURALIZATION.**

Naturalization of an alien· is not conclusive as to his domicile in the country of his adoption since citizenship or nationality and domicile involve different principles, and a citizen of any country may retain his citizenship therein, and yet have his last domicile out of that country.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. § 10.\*]

**3. EXECUTORS AND ADMINISTRATORS (§ 29\*)—PROBATE PROCEEDINGS—NATURE —PROCEEDING IN REM—RES JUDICATA.**

While a probate proceeding is generally regarded as in rem, and binding on all the world as to the status of executors and administrators and their title to the goods, chattels, and credits of the decedent, grants of probate or administration are not conclusive as to the death of the testator or intestate nor as to his last domicile or residence.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 177-182, 1411; Dec. Dig. § 29.\*]

**4. ESTOPPEL (§ 68\*)—INCONSISTENT POSITIONS—TRANSFER TAX PROCEEDING— PROBATE PROCEEDINGS.**

A proceeding to fix the transfer tax on a decedent's estate is independent of the probate proceedings, within the rule that parties in the same proceeding are not permitted to take inconsistent positions, so that the fact that the distributees of an estate procured the probate of decedent's will in New York, on the theory that he was a resident of that state when he died, did not prevent them from taking the position in the proceedings to assess the transfer tax that he was in fact domiciled in Cuba when he died.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 165–169; Dec. Dig. § 68.\*]

**5. DOMICILE (§ 10\*)—EVIDENCE.**

In proceedings to assess a transfer tax against decedent's estate evidence *held* to require a finding that, though a citizen of the United States, he was domiciled in Cuba at the time of his death.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39; Dec. Dig. § 10.\*]

Judicial settlement of the estate of Tirso Mesa y Hernandez. Proceeding for appraisal of the transfer tax on property belonging to the estate located in New York. Tax ordered assessed on the theory that decedent was a nonresident.

Charles Stewart Davison, of New York City, for beneficiaries.

Coudert Bros., of New York City, for executors.

Thomas E. Rush, of New York City (Thomas A. S. Beattie, of New York City, of counsel), for State Comptroller.

FOWLER, S. This is a transfer tax proceeding, in which the appraiser files his report setting forth the assets of the estate and its distribution, subject to the determination of the true domicile of the deceased by the surrogate.

The recitals of the assets in the report of the appraiser are based upon the fact that the decedent died domiciled in our county of New York. Exceptions were filed to so much of the appraiser's report as found that the decedent was at the time of his death a resident of the county of New York; to so much of the report as appraises the estate of the deceased on the basis or theory that the deceased died

a resident of the county of New York; to so much of the report as appraises the property of the deceased situated outside the state of New York at the time of his decease as subject to taxation in this proceeding; to the failure in said report to find that the deceased died a nonresident of the state of New York; to so much of the report as found that the "gannanciales" or community interest of the widow of the deceased in the property which constituted the joint or community estate of the deceased and herself, under the Spanish law, is subject to taxation in this proceeding under the Transfer Tax Law of this state; to so much of the report as appraises the joint or community estate of the decedent and his widow as subject to taxation in this proceeding without deducting the "gannanciales" or community interest of said widow therein; to the failure of said report to find that the widow of the deceased had an equal one-half interest in the property which constituted the joint or community estate of said deceased and herself under the Spanish law, which said one-half interest is claimed to be not subject to taxation in this proceeding under the Transfer Tax Law of the state of New York. Thus practically the sole question for determination by the surrogate is: What was the domicile of the deceased at the time of his death?

The facts apparent in the record are substantially as follows: Mr. Mesa y Hernandez died on the 29th of November, 1908, at one of his plantations called "Colonia Violet." This plantation was named for the daughter of the deceased, and was situated at Aguade de Pasageros in the republic of Cuba. Deceased left him surviving a widow, Josefina Garcia Pola Mesa y Hernandez, and two sons, Tirso Luciano Mesa and Hannibal Justo Mesa, and one daughter, Violet Hope Mesa. His body was thereafter removed to the town residence of the family of deceased, No. 2 San Lazaro, in the city of Havana, Cuba, where the funeral was held. His body was thereafter interred in the family mortuary chapel in the Cristobal Colon cemetery at Havana. Deceased had built this chapel in 1904 at a cost of some $17,057.12; the burial vaults therein being five in number, corresponding to the number of the members of his family.

The deceased, whose proper name is Tirso Mesa, but who, in accordance with the Spanish custom of adding the mother's name, is described as Tirso Mesa y Hernandez, was born (as the undisputed testimony of the widow and of his two sons and his private secretary, Juan Jose de Mutiozobal, shows) in the town of Colon, in the island of Cuba, in 1848, and he resided in that island until his marriage on February 24, 1881, to Josefina Garcia Pola, who is also a native and resident of the aforesaid town of Colon. At the time of their marriage the spouses were both subjects of the king of Spain, and their marriage was contracted under the community system of the Spanish law, in substance providing for a partnership in and joint ownership of all the property acquired by a husband and wife during marriage, the management thereof being vested in the husband. By such law, upon the death of either husband or wife, the debts and the amount which each spouse originally brought to the marriage is deducted from the joint estate, and the remainder composes the net joint estate. Of

this net estate one-half is the absolute property of the survivor, while the other one-half is the absolute property of the estate of the decedent. The provisions of the Spanish law in this regard have been put in evidence.

It appears that after their marriage the deceased and his wife went to live at their sugar plantation "La Vega," at Manguito, Cuba. The first time that Mr. Mesa y Hernandez left the island of Cuba appears to have been in the summer of 1888, when he went to Saratoga for a month, pursuant to a physician's order, to recruit his health. In 1889 he was again away from Cuba during the month of July, during which absence he visited the Paris Exposition and spent a short time at Saratoga to recruit his health. His family remained in Cuba while he made these two trips. In 1890, 1891, 1892, and 1893 the deceased gentleman and his family spent about a month each summer in New York for their health and pleasure. Each time they visited New York they sojourned at hotels, principally the Holland House, but sometimes the old Plaza Hotel or the Majestic. The balance of the time, during all these years, was spent by deceased in Cuba. From July, 1894, until January 27, 1900, Mr. Mesa and his family traveled much in Europe and the United States. They spent two weeks in New York in July, 1894, and then they went to Europe, where they traveled for two years, or until June, 1896. The last insurrection in Cuba began in 1895, and culminated in the war between the United States and Spain, ending in 1898. On returning from Europe in 1896, decedent had trouble in getting home to Cuba on account of the war. He and his family proceeded as far as Port au Prince, where they learned that their house on the "La Vega" estate had been burned down in July, 1896. They spent the next two years, until May, 1898, traveling in the United States, going as far west as Colorado. They then again proceeded to Europe, where they remained until January 27, 1900, except for a three weeks' visit to Cuba in December, 1898.

After the war with Spain was finally ended, Mr. Mesa y Hernandez arranged for the rebuilding of his house at "La Vega." They returned to Cuba in February, 1900, after the period of traveling was over and the new house at "La Vega" had been completed, and then actually lived at "La Vega." Such furniture as had been burned with the house they replaced with new furniture, which decedent had purchased in London and elsewhere for that purpose. Decedent and his family continued to make their home at "La Vega" until 1904, when he purchased a town residence in Havana, Cuba, at No. 2 San Lazaro, and thereafter they occupied both "La Vega" and the town house in Havana as family residences. In the spring of each year, from 1900 down to the year of his death, 1908, Mr. Mesa y Hernandez and his wife would go to Europe and spend from six to nine months each year traveling in England or on the continent. Necessarily they passed through New York twice each year on these journeys to and from Europe. They would remain in New York on these occasions only a few days while awaiting the sailing of the steamer to Europe or to Havana if they were returning home. The longest time they

remained in New York was in the year 1905, when they spent a month in the Catskills while en route to England; the testimony showing that the heat in New York at that time was so oppressive that they went up to the Catskills to await the steamer sailing for Europe. Each time they were in New York they put up at hotels. The testimony is uncontradicted that they never leased or occupied a house or apartment in the city of New York or any place in the state of New York.

A detailed schedule of the places of actual inhabitancy of the decedent has been put in evidence by the beneficiaries. It shows the time spent by the decedent in New York state from his birth in 1848 until his death in 1908 was as follows:

| Year. | Time Spent in N. Y. |
|---|---|
| 1888 | One month |
| 1889 | Two weeks |
| 1890 | One month |
| 1891 | One month |
| 1892 | One month |
| 1893 | One month |
| 1894 | Two weeks |
| 1896 | Five months |
| 1897 | Six months |
| 1898 | Four months |
| 1900 | Ten days |
| 1901 | Three weeks |
| 1902 | Two weeks |
| 1903 | Ten days |
| 1904 | One week |
| 1905 | Three weeks |
| 1906 | Three weeks |
| 1907 | Five weeks |
| 1908 | One week |

During the same years decedent spent $3\frac{1}{2}$ times as much time in Europe as in America as shown by the following schedule:

| Year. | Time Spent in Europe. |
|---|---|
| 1889 | Two weeks |
| 1894 | Five and one-half months |
| 1895 | Twelve months |
| 1896 | Six months |
| 1898 | Six and one-half months |
| 1899 | Twelve months |
| 1900 | Seven months |
| 1901 | Seven months |
| 1902 | Nine months |
| 1903 | Four and one-half months |
| 1904 | Five months |
| 1905 | Four and one-half months |
| 1906 | Four and one-half months |
| 1907 | Five months |
| 1908 | Four and one-half months |

The uncontradicted testimony of the members of the family of deceased, his wife, his two sons, and his private secretary shows that he always regarded "La Vega" as his home, and that in registering at hotels he gave "La Vega, Cuba," as his residence. All the business interests of the deceased were in Cuba, where he was engaged in the sugar business, planting and growing sugar cane on plantations

which he owned and selling the cane and sugar milling. He was president of the Matanzas Railway Company in Cuba, and he was a director of the United Railways of Havana and of the Regla Warehouse, Limited, a Cuban corporation. At the time of his death he was a member of the Union Club of Havana and of the Cuba International Racing Club. He never belonged to any New York club. In addition to the residences owned by deceased in Cuba, he and his wife jointly owned some 20 odd separate pieces of real estate in Cuba. They never owned any real estate in New York, or anywhere else in the United States. Decedent never was engaged in any business here. From time to time he, however, invested moneys made in Cuba in securities purchased through his New York bankers. The testimony shows that Mr. Mesa y Hernandez never expressed any intention of taking up a residence in New York. In fact, it shows that he many times stated that he did not like the climate of the city of New York and objected to living there. The only property of the deceased located in the state of New York at the time of his death was the securities purchased by him, which were held in the safekeeping of his bankers, Messrs. Lawrence Turnure & Co., of this city. These securities have been appraised by the transfer tax appraiser at $563,-221.66. Deceased had on deposit with his bankers in London securities to the value, as appraised by the transfer tax appraiser, of $40,-069.51. This much for the proof offered by the beneficiaries to sustain their claim that the last domicile of the deceased was not in New York.

On the other hand, the evidence offered to sustain a last domicile in the county of New York is about as follows: On the 21st of June, 1900, the decedent verified a petition as an applicant for admission to citizenship of the United States of America. In this petition he swore that he emigrated to the United States, landing at the port of New York on the 10th day of July, 1888; that he now resides at No. 55 West Twenty-Seventh street, in the city of New York; that he was over 21 years of age; that he resided continuously in the United States since July 10, 1888, and continuously within the state of New York since July 10, 1888. An affidavit by one Mr. Edward F. McManus is also attached to the petition in which he swears that he is a citizen of the United States; that he resides at No. 72 West Eighty-Seventh street; that he is a merchant and that he personally knows that the applicant, Tirso Mesa y Hernandez, has resided continuously within the limits and in the jurisdiction of the United States of America since June, 1890, and continuously within the city of New York since June, 1890, and that during said time of his residence within the United States and within the city he had behaved as a man of good moral character, etc. The petitioner, the deceased, and his witness appeared before Mr. S. H. Lyman, in the United States District Court for the Southern District of New York, and were orally examined and the proofs taken upon this petition. He was then admitted to citizenship by the United States District Court of the Southern District of New York on the 23d day of June, 1900. These affidavits, upon which the certificate of citizenship was issued, were put

in evidence under objection and exception. The testimony in regard to this naturalization discloses that the deceased announced to his wife his intention of taking out naturalization papers while they were living in Cuba in 1899, the year after the war was over, giving as his reason therefor that his property was then in danger; that his home had once been destroyed during the Spanish war, and that, as the United States soldiers were still in Cuba, he was going to take out American citizenship papers in order to protect his property. He also mentioned the same thing to his son Hannibal in 1900. The testimony also shows that in 1902 Mr. Mesa y Hernandez contributed a substantial sum towards the election expenses of President Estrada Palma of Cuba, and that he expected to receive from him an offer of the position of ambassador or minister of the republic of Cuba to the court of St. James, showing that he still held himself to be a citizen and resident of the republic of Cuba. It also appears that the will of the deceased was executed by him on December 19, 1906, on his way to Cuba from England. It was so executed in the city of New York, and it recites that he "is a native of Colon, in the province of Matanzas, island of Cuba, but now a citizen of the United States, residing and domiciled at the city of New York."

This will created a number of trust funds and provided for the payment of various annuities and legacies, and on several occasions the deceased stated to members of his family that he was aware that its provisions contravened the provisions of the Cuban law as to the right of a person who died leaving children to dispose of his property. It is suggested that this was the reason for stating that the domicile of deceased was in the city of New York, as the validity of the will might depend on the law of New York. In the will decedent named as executors Paul Fuller and Jose M. Andreni, who were not related to him. This last will and testament of the deceased was probated in the county of New York upon the petition of *these executors, alleging that the deceased died a resident of the county of New York.* No objection was made to this probate by the beneficiaries or any party interested, and letters testamentary were accordingly issued by this court on the 29th day of January, 1909, to the executors named in the will. The question of the domicile of the deceased was not put in issue in the probate proceeding, or until the transfer tax proceedings were instituted. It is now argued by the state that all parties in interest in the probate proceeding, having failed to object to the finding that the decedent died a resident of New York county, are bound by that finding.

[1] It is most obvious from the evidence before me that the last domicile of the deceased, Tirso Mesa y Hernandez, was not in this state. That on several occasions, probably for the protection of himself and his family under the trying circumstances of late years experienced by Cuban gentlemen of property, the decedent contemplated some sort of a domicile of choice in the state of New York is apparent from the evidence in the record before me. But a domicile of choice consists of more than intention. A domicile of choice may, if actual, be superseded by another domicile of choice, or the domi-

cile of origin may prevail, if doubt exist as to the last domicile of choice.

It is urged by the state that the naturalization of decedent by the United States of America, the declaration contained in decedent's own will, and the statements of others made in the probate proceeding in this county and the decree entered thereon are conclusive evidence of decedent's last domicile or last residence in this state. Domicile and residence, it may be noted, are not always convertible terms. Matter of Newcomb, 192 N. Y. 238, 84 N. E. 950. But the last place of residence may be the last domicile of one deceased. In this case the last residence was the last domicile of the deceased.

[2] The naturalization of decedent is not conclusive. Citizenship or nationality and domicile involve different principles. A citizen of any country may retain his citizenship in that country and yet have his last domicile out of that country. This I apprehend is a very plain and indisputable proposition of law, unnecessary to be considered at this time. The late Mr. Mesa y Hernandez may have been a citizen of the United States at the time of his death, and yet have had his last domicile or residence in the republic of Cuba.

[3] On the part of the state it is urged, with some show of reason, that the decree in the probate proceeding is conclusive as to all the parties appearing in this proceeding, whether actual parties to the probate or not. It is true that a probate proceeding is generally regarded as one in rem, and as such it binds, not only parties, but all the world. Whicker v. Hume, 7 H. L. Cas. 124; Concha v. Concha, 11 App. Cas. 541; In re Lasak, 131 N. Y. 624, 626, 30 N. E. 112. It is admitted in some of the books of the law that there is no complete definition of a proceeding in rem. This may be so. Definition is a logical feat of the greatest difficulty and complexity at all times. It is not necessary to attempt a definition of a proceeding in rem; it is decided that grants of probate, while regarded as proceedings in rem, and as such conclusive as to others than the parties, are only so conclusive as to others as to certain matters. Probates or administrations are conclusive inter alia as to the status of executors and administrators, and as to their title to possess the goods, chattels, and credits of one deceased. Allen v. Dundas, 3 T. R. 125, 129; Whicker v. Hume, 7 Ho. L. Cas. at pages 144, 156; Concha v. Concha, 11 App. Cas. 541, 551.

Grants of probate or administration are not conclusive as to the death of a testator or intestate. Mutual Benefit Life Ins. Co. v. Tisdale, 91 U. S. 238, 23 L. Ed. 314. Nor are they conclusive of the last domicile or residence of the deceased. Flatauer v. Loser, 156 App. Div. 591, 141 N. Y. Supp. 951; Matter of Grant, 83 Misc. Rep. 257, 260, 144 N. Y. Supp. 567; Concha v. Concha, 11 App. Cas. 541; Tilt v. Kelsey, 207 U. S. 43, 28 Sup. Ct. 1, 52 L. Ed. 95. Tilt v. Kelsey is relied on in behalf of the state, and it is claimed that the judgment there rendered supports the proposition that a grant of probate is a conclusive adjudication in rem on the question of last domicile. I do not so read the judgment in that case, which turns wholly upon the faith and credit clause of the federal Constitution.

To my mind that judgment has little relevancy to the situation disclosed in this matter.

That there is some inconsistency apparent in this record in the claims of the domicile of the late Mr. Mesa y Hernandez is evident. But it is not fatal to the conclusion that his last domicile was in Cuba. The proceeding for probate, although taken in the same court for this county, is distinct from this proceeding.

[4] The proceeding to fix the transfer tax is an independent proceeding. It is a familiar rule of procedure in courts of justice that parties to the same proceeding are not permitted *in the same proceeding* to take inconsistent positions at the same moment. This is only the paraphrase of the fundamental canon of logic on which all accurate reasoning and procedure are based, that the same proposition or affirmative assertion cannot at the same time be true and not true, exist and not exist. In other words, contradictories are incompatible at the same moment. But this rule does not prevent an inquiry into the real domicile in this proceeding.

[5] There were various grounds of jurisdiction in the probate proceeding besides the last residence of the deceased. The probate decree is not final here as I have shown, on the question of testator's last domicile. In this proceeding for fixing the transfer tax I know of no principle which prevented or estopped all the persons interested in the succession to the estate of the late Mr. Mesa y Hernandez from showing the fact to be that he was not a resident of this state when he came to die, but was then domiciled and resident in Cuba. That they have established as matter of fact a last residence or domicile in Cuba I am convinced by the very clear case made and now before me.

I therefore find and hold that the last domicile and residence of the late Tirso Mesa y Hernandez was in the republic of Cuba and not in the state of New York. The appraiser's report will be remitted to him for correction in accordance with this decision.