Matter of the Judicial Settlement of the Account of HENRY OVERING TALLMADGE as Executor of the Will of COSTER CHADWICK, Deceased.

(Surrogate's Court, New York County, October, 1919.)

*Domicile — decedent born in New York died in France where he had lived since he was seven years of age — under section 47 of the Decedent Estate Law the foreign law (French Civil Code, §§ 1039, 1044), must be applied in construing residuary clause of will — doctrine of " renvoi " and " desistement " — proof of foreign law.*

PROCEEDINGS upon the judicial settlement of the accounts of an executor.

REPORT of referee determining the domicile of the testator and the law to be applied in construing the will.

Wilder, Ewen & Patterson (William R. Wilder and John Ewen, of counsel), for executor.

Merrill, Rogers & Terry (Charles Thaddeus Terry, of counsel), for defendant Rose Chadwick, contestant.

Stewart & Shearer, for United States Trust Company, as general guardian of Maud Coster and others.

Lewis Spencer Morris, for Emily Pell Morris and others.

George N. Whittlesey, for Stanley W. Dexter and Elizabeth Baker.

EGERTON L. WINTHROP, JR., Referee. This matter comes up on an objection to the proposed method of distribution of the residuary estate of Coster Chadwick, the other objections having been withdrawn or otherwise disposed of. It is necessary to determine the law to be applied in the construction of the residuary clause of the will of Coster Chadwick. By his will, after making several bequests, including one of ten dollars to his brother, the contestant, he gave his residuary estate as follows: "*Eighth.* All the rest, residue and remainder of my estate, both real, personal and mixed, and of which I may die seized and possessed, I hereby give, devise and bequeath to my aunt, Henrietta Taletta Tallmadge, and my cousin, Ida Bisland Williams, share and share alike, to have and to hold unto them, their heirs, executors, administrators and assigns absolutely and forever."

The problems presented are: *First,* to ascertain the domicile of Coster Chadwick at the time of his

death; and, *second,* to determine whether the law of France or that of New York shall be applied in construing this clause of the will.

Coster Chadwick was born in New York city on January 23, 1852. At seven years of age he left the United States with his parents, who were Southern sympathizers, and lived continuously with them at Paris or Nice, in France, until their deaths. Both of them were buried at Nice. Whether they had acquired a domicile in France or not was not definitely shown, but such proof as there is indicated that they had no intention ever to return to America. Coster Chadwick, however, lived in France, either at Paris or Nice, from 1859, for about fifty-five years, or until his death in August, 1914. After her husband's death Mrs. Chadwick and her son occupied an apartment in Nice at No. 2 Rue Dante, subsequently known as No. 4 Rue Dante, for the remainder of her life, and Coster continued to live there until his death.

Coster Chadwick was educated in France and spoke both English and French fluently. He had no business education, was supported by his parents during their lives and after their deaths lived on the inheritance he got from them; his whole time was devoted to social, artistic and literary pursuits. From 1892, just after his mother's death, until August, 1914, he made four visits to the United States; each of them was to New York and vicinity. There is no evidence that he made more than one or two other visits. These visits were for business purposes and were for a few months only. When in New York he stopped at hotels or visited relatives and, from statements made by him at the time of the visits, it was clear that he never had any intention of coming to New York to reside, but intended to return to Nice. The reasons given by him for his living in Southern France were his preference for the climate and the fact that his income would go further there

than in this country. Moreover, the apartment in which he lived from the date of his mother's death until his own death was leased by him and furnished with his belongings and when he came to this country he left a servant in charge — all of which indicates to my mind an intention of returning to Nice as to a permanent residence.

In reaching the conclusion that Coster Chadwick's domicile was France, I have assumed that his domicile of origin was New York. As his parents were living in France in 1873, when he came of age, his status there comes within the description of domicile by Dicey in " The Conflict of Laws " (2d ed.), at page 108:

" Every person begins life as a minor, and therefore as a dependent person (which can in no case happen before he attains his majority), he will find himself in possession of a domicil, which will in most cases be his domicil of origin, but may be a domicil acquired by the act of the person on whom he is dependent during infancy.

" He can then obtain or retain for himself by his own act and will a legal home or domicil * * * and called a domicil of choice. This domicil is acquired by the combination of residence, and the intention to reside, in a given country."

This seems to apply to the status of Coster Chadwick.

In my opinion it has been established that Coster Chadwick's residence in Paris and Nice, France, comes within the definition of domicile given to that word by the courts in numerous cases. The Court of Appeals in *Matter of Newcomb,* 192 N. Y. 238, discussed this question fully, and at page 250 said: "As domicile and residence are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning, but they are not identical terms, for a person may have two places of residence, as in the city and country, but only one domicile. Residence means

living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile.

" The existing domicile, whether of origin or selection, continues until a new one is acquired and the burden of proof rests upon the party who alleges a change. The question is one of fact rather than law, and it frequently depends upon a variety of circumstances, which differ as widely as the peculiarities of individuals. Less evidence is required to establish a change of domicile from one state to another than from one nation to another. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence is of no avail. Mere change of residence although continued for a long time does not effect a change of domicile, while a change of residence even for a short time with the intention in good faith to change the domicile, has that effect. *Uno solo die constituitur domicilium si de voluntate appareat.* Residence is necessary, for there can be no domicile without it, and important as evidence, for it bears strongly upon intention, but not controlling, for unless combined with intention, it cannot effect a change of domicile.''

It seems to me to have been proved beyond a question that at the time of his death Coster Chadwick was a resident of and had a domicile in Nice, France. The surrogate, in an application for an exemption of the estate from transfer tax in this state, so found, and, again, in an application by this same contestant to vacate the order containing this finding on affidavits which embodied substantially the same evidence in regard to New York residence as was submitted on this reference, denied the motion. Great stress was

laid then, and is now, on the fact that in various legal documents the decedent is recited as being of " Yonkers, Westchester County, New York," of the " City, County and State of New York," or as " sojourning in Nice, in the Republic of France," or similar phrases are used in regard to his residence. In the will itself testator states that he is " of the City, County and State of New York." Such a recital in a will is not conclusive. *Mackenzie* v. *Mackenzie*, 3 Misc. Rep. 200; *Matter of Cleveland*, 28 id. 369; *Matter of Riley*, 86 id. 628. Nor are such recitals in deeds and wills given particular weight in determining this question of residence, in comparison with the evidence supplied by the daily life of the individual and his acts and conduct.

In *Curtis* v. *Curtis*, 185 App. Div. 391, 396, the court said: " Nevertheless, reliance is placed by the appellants upon the declaration contained in the recital in the deed of trust, executed while Mrs. Curtis was sojourning at her son's home, that they are ' both resident of the City of Plainfield, County of Union and State of New Jersey.' Little force attaches to such a declaration as against what may be called the acts of the person, whose domicile is in question, going to make up the manner and conduct of life." See, also, *Matter of Harkness,* 183 App. Div. 396, 407; *Matter of Morgan,* 176 id. 909; *Matter of Mesa y Hernandez,* 87 Misc. Rep. 242; affd., 172 App. Div. 467; *Matter of Rothschild Estate,* 86 Misc. Rep. 364.

In the *Rothschild Case, supra,* the surrogate held that the decedent was domiciled in France, and the facts in that case seem to be quite similar. I quote from the surrogate's opinion, in which he said as follows: " The evidence before the transfer tax appraiser conclusively shows to my mind that the domicile of the late Charles A. Rothschild at the time of his death was in France. His household and household effects were maintained in France continuously since the year 1905, when he

abandoned his prior domicile in New York *sine animo revertendi.* Since 1905 Mr. Rothschild lived only in France. Both the *animus* and the *factum* elements of a domicile in France are amply established in this instance by uncontradicted testimony. The fact that the attorney or even the executor was under a misapprehension at an earlier stage concerning Mr. Rothschild's last domicile is of no consequence. The principle of a decedent's domicile is not affected by estoppels against others, nor are the allegations of personal representatives conclusive on an issue of last domicile of their testator. (*Matter of Grant,* 83 Misc. Rep. 257, 260.)''

That New York was the state of his nationality at the time of his death is not in doubt, but nationality is of little importance in determining a question of domicile. A man may retain his nationality and citizenship and yet become domiciled in a foreign country. There are many examples of this amongst those whose wills have been construed by our courts. Assuming, then, that an American, sufficiently patriotic to wish to retain his allegiance to the United States, can acquire a foreign domicile, it is difficult to think of a person who could have done this more effectually than Coster Chadwick. His childhood and long life in France, his knowledge of its language and institutions, his preference for his friends in that country, his tastes and associations, his infrequent visits to America, his lack of a permanent abode in the United States, his dislike of members of his own family — all combined to make him regard Nice as his home — the place where he lived and wished to live and to which he intended to return.

What his reasons were for this preference of a foreign residence is of small moment. Counsel for contestant questioned them as indicating a compulsory expatriation, and therefore as being contradictory of an intention to effect a change of domicile. The court

in the Newcomb case disposed of any such argument for at page 251 it said: "Motives are immaterial, except as they indicate intention. A change of domicile may be made through caprice, whim or fancy, for business, health or pleasure, to secure a change of climate, or a change of laws, or for any reason whatever, provided there is an absolute and fixed intention to abandon one and acquire another and the acts of the person affected confirm the intention."

The facts in the *Chadwick* case are quite different from those in *Dupuy* v. *Wurtz*, 53 N. Y. 556, where an enforced absence contrary to the wish or intention of the person was held not sufficient to effect a change of domicile, and are quite similar to those in *Hegeman* v. *Fox*, 31 Barb. 475, distinguished and approved on its own facts in *Dupuy* v. *Wurtz*.

If Coster Chadwick's domicile of origin was New York, the burden of proof is on the executor to show that he had acquired a domicile in France. *Matter of Newcomb, supra.* This, I think, he has done. A domicile of choice thus having been established, the burden of proof is on the contestant to show that a new domicile had been acquired in New York, and this, I think, he has failed to do. If the domicile of origin was in France, then *a fortiori* has the contestant failed to sustain the burden of showing that decedent had acquired an American domicile.

Having found that Coster Chadwick was a resident of and was domiciled in Nice, France, at the time of his death, it becomes necessary to determine the law to be applied in the construction of the residuary clause of his will.

The executor claims that the courts of this state are bound under section 47 of the Decedent Estate Law to regulate the disposition of this decedent's property "by the laws of the state or country, of which the decedent was a resident at the time of his death." Residence as

used in the statute means " domicile." See *De Meli* v. *De Meli,* 120 N. Y. 485, 491; *Matter of Cleveland,* 28 Misc. Rep. 369, 371; and *Matter of Seixas,* 73 id. 488, 492, where section 23 of the Decedent Estate Law is construed and the word " residence " (used in a similar way to its use in section 47) is held to mean " domicile." This definition of residence is most favorable to contestant for, if the statute means residence in its narrowest sense, the French law must be applied, as Coster Chadwick was surely a *resident* of Nice.

If we then look to the law of France, meaning thereby the internal or territorial law of that country, we find sections 1039 and 1044 of the French Civil Code. The translations of these are as follows:

Section 1039. " Every testamentary provision made in favor of a person who has not survived the testator lapses."

Section 1044: " When a bequest has been made to several persons jointly and the bequest to any of them has lapsed, then such bequest falls into the share of the other persons to whom the joint bequest has been made. A bequest is treated as made to persons jointly when it is made by one and the same disposition and no special part has been allotted therein to each joint beneficiary." The cases cited by the expert Hannon upon section 1044 show that the words " share and share alike," as used in the residuary clause of Coster Chadwick's will, do not take the case out of that section. *Guegan* v. *Heno,* Court of Cassation, Sirey Lois et Arrets, 1879–I–193; *Wyons* v. *Tauffour,* Sirey 1857–I–254; *Wyon* v. *Wyon,* Sirey 1857–II–37. In these cases the words " share and share alike," or their equivalent were used. If the French law is correctly stated by the counsel for the executor, then, as testator's cousin Ida Bisland Williams predeceased him, under the laws of France Henrietta Taletta Tallmadge

became entitled to receive the entire residuary estate by reason of the death of her colegatee.

The contestant, on the other hand, claims that Coster Chadwick was a resident of New York and that he was domiciled in this city at the time of his death; but that, even if it be assumed that his domicile was in France, as the courts of that country apply the national law of the testator on the assumption that such is his intention and as, in addition, the facts of this case show an intention on the part of the testator to have his will construed according to the law of New York, the New York law is applicable to the interpretation of the will. The result of this application would be that the half of the residuary given to Ida Bisland Williams lapses by reason of her death prior to the testator's and passes under the Statute of Distribution to John Rose Chadwick, testator's brother.

In support of this contention contestant called an expert, Dr. C. H. Huberich. He was of the opinion that the French courts would apply in this case the national law of the testator, and cited numerous French decisions and the opinions of French law writers in support of his theory. This is undoubtedly a correct statement of the general principle of French jurisprudence in reference to the conflict of laws in such cases, and the acceptance of Dr. Huberich's theory in the present case would result in the application of the internal law of New York to the construction of the will in accordance with the French view of the conflict of laws.

There is thus squarely presented to the court for consideration the complicated and difficult theory known as the " renvoi " (of which the word " remission " is perhaps a fair translation). In other words, the referee is called upon to decide whether section 47 of the Decedent Estate Law, in referring the construction of the residuary clause of Coster Chadwick's will

45

to the law of France, meant that the specific provision of French law applicable to lapsed legacies should be applied, or the French view of the conflict of laws with its reference back to the law of New York for the determination of the question of this lapse. Each of the learned counsel discusses this question, but, it seems to me, without an exhaustive analysis of the effect of the theory in the present case and its general consequences.

At the outset it might be remarked that the proposition is new in this state and has received, so far as I can find, no judicial consideration. The various phases and complexities of the theory are discussed at length in Bate, Notes on the Doctrine of the Renvoi; Abbott, Is the Renvoi a Part of the Common Law? (24 Law Quarterly Review, p. 133); Bentwich, The Law of Domicile in its Relation to Succession; The Renvoi Theory, by Professor Ernest C. Lorenzen (10 Columbia Law Review, pp. 190, 327, cited in *Matter of Seixas, supra*) and The Doctrine of the Renvoi in Anglo-American Law, by Ernst Otto Schreiber, Jr. (31 Harvard Law Review, p. 523).

To determine the validity and effect of the will of Coster Chadwick, who was domiciled in France, we must look first to section 47 of the Decedent Estate Law. This section is largely declaratory of the law as it existed at the time of its enactment. The English and American view of the conflict of laws requires that in cases of succession the law of the domicile governs as regards personal property. In Story's Conflict of Laws (8th ed.), section 479-f, the law is thus set forth: " But the question may be asked in these and the like cases, what is to be the rule of construction, if the will or testament is made by the party in the place of his domicil; but he is in fact a native of another country; or, if the will or testament is made in a country of which the party is a native, and according to the forms of law in that country, and yet at the time his actual

domicil is in another country, by whose laws the will or testament so made is equally good. The answer to both questions is the same. The law of the place of his actual domicil. Thus, for example, where a native of Scotland, domiciled in England, having personal property only, executed during a visit to Scotland, and deposited a will there, prepared in the Scotch form, and died in England; it was held, that the will was to be construed according to the English law."

And so in section 481 as to intestate succession: "The universal doctrine, now recognized by the common law, although formerly much contested, is that the succession to personal property is governed exclusively by the law of the actual domicil of the intestate at the time of his death." (See, also, *Moultrie* v. *Hunt,* 23 N. Y. 394; *Dupuy* v. *Wurtz,* 53 id. 556, 560; *Cross* v. *United States Trust Co.,* 131 id. 330, 339; *Matter of Flatauer,* 182 App. Div. 884; affd., *Matter of Loser,* 223 N. Y. 579; *Matter of Martin,* Eng. Court of Appeal (1900) Probate, 211; *Hamilton* v. *Dallas,* L. R. 1 Ch. Div. (1875) 257. This principle is too firmly embedded in Anglo-Saxon law to require extended citation of authorities. It was based originally on the idea of international comity, but is now regarded as resting rather on the dictates of jural necessity. See Bate, Notes on the Doctrine of Renvoi, *supra; Cross* v. *United States Trust Co.,* 131 N. Y. 330, 340. The *lex domicilii* has been stated to be the law regulating the construction of a lapsed legacy. Wharton in Conflict of Laws (Vol. 11, 3d ed., § 599f, at p. 1353) says that the question " where a legacy lapses upon the death of the legatee before testator's death depends upon the law of the testator's domicil," and " whether a lapsed legacy falls into the residuary bequest depends upon the law of the testator's domicil."

See also *Anstruther* v. *Chalmer,* 2 Sim. 1; 57 Eng. Rep. full reprint, 691; an English case wherein the

High Court of Chancery applied the *lex domicilii* in determining a question concerning the lapse of a legacy upon facts very similar to those in the Chadwick case.

We thus find that section 47 merely embodied the law as it was in this state at the time of the enactment of this section.

If the French jurisprudence took the same view of the conflict of laws, the will of Coster Chadwick would be construed according to French law. But the French view is entirely different. In general, French courts construe the will of a decedent in accordance with the law he was presumed to know best, namely, the law of his nationality. The propriety of this presumption in the present case would seem at least doubtful as Coster Chadwick had passed practically his whole life in France, spoke the French language like a native, and must, in fact, have been at least as familiar with the laws and institutions of France as with those of America. It might be noted in passing that even the French courts admit exceptions to the rule. *De Viaris* v. *Courtin,* Civil Tr. of Seine, March 9, 1895.

The courts and writers sanctioning " renvoi " would insist that in such a case as that at bar the New York court, acting under section 47, must apply the French law, meaning not the territorial law of France, but the totality of French law, including its method of determining questions of conflict of laws, and that therefore it will apply the New York law, for the French view of the conflict of laws refers the construction of the will to the national law of the testator. Under this view the, New York court would accept the reference. This would be a simple case of the application of the " renvoi." The same result would be reached in this case by the application of that variation of the " renvoi " doctrine, known as the " desistement " theory, for which contestant's counsel seems to argue, and as to which further reference will be made in this opinion.

The case thus presented to a New York court differs not at all in principle from a case arising in France with regard to the construction of the will of an American domiciled in France. In such a case the French court would refer the question of construction to the New York law, and, as section 47 of the Decedent Estate Law refers the construction back to the French law (the domiciliary law), the French court would apply the French law. The French court accepts the " renvoi," for " renvoi " is a part of the law of France. 10 Columbia Law Review, p. 194. See, also, the case usually known as the *Forgo* case, which appears in the exhibits and papers in the case at bar under the title *Forg-Dicth Heirs* v. *Tax Adm'n,* Court of Cassation, Feb. 22, 1882, Clunet, 1883, p. 64, and the other decisions which are exhibits in this case. The *Forgo* case determined this principle for France.

But, logically, why should the inquiry stop with the internal law of New York on the reference from the French law? Why, indeed, should the reference be to the internal law of New York and not to its conflict-of-laws rule again? In the first instance, the New York court, in seeking to apply the French law, was, by hypothesis, referred to the French conflict-of-laws rule instead of its internal laws. Why not the same character of reference upon the return? It is clear that the logical result of this reference back and forth to the conflict-of-laws rule of the respective countries would be an indefinite oscillation between the two laws. As well said by Buzzati (Rinvio, p. 77), quoted in Bate, this is " an eternal renvoi from one rule of conduct to another without ever descending to the application of an internal law, a closed circle with no exit. It is the application of lawn tennis to international law."

But this is a practical if not a logical absurdity. A possible alternative is the application of French internal law on the second reference. For, if a New York

court in attempting to apply French principles governing the conflict of laws must regard itself as a French court, a view that has been urged by many of the courts indorsing " renvoi," it should apply the law as a French court would apply it. But the French court would look to the national law (the law of New York) and then accept the reference back to France — in other words would apply the law of France — so that the New York court, sitting as a French court, would apply the French law — the result being the same as if there were no " renvoi " at all; in other words, as if the New York court applied French territorial law in the first instance under its own view of the conflict of law. See similar example on page 199 of 10 Columbia Law Review, and note on page 206, as to effect of court's sitting as court of foreign country. The true meaning of this last result is that " renvoi " is assumed to be the law of both New York and France.

There remains only the " desistement " theory. By it a New York court in such a case as Coster Chadwick's will apply the New York law. In the first instance that court refers the matter to the law of France, but as it is claimed that there is no law in France applicable to the construction of the will of a foreigner domiciled *de facto* therein without the authorization of section 13 of the French Code, and as, therefore, the French courts decline jurisdiction in such a case, there exists a hiatus which the New York court fills by the application of the New York law in the exercise of the right of sovereignty. This theory has been developed at length by Westlake (see exposition in Bate) and has been applied in certain French cases, of which *Dreyfus* v. *Lecoutourier* (Civil Tr. of Seine, 2d Div., 1st Sec., August 10, 1908), cited by the contestant, is one. Whatever the merits of the argument for the theory (and I see little to be urged in its favor) I am convinced that I must disregard it, for the result is

in flat contradiction of what I conceive to be the direction of section 47 of the Decedent Estate Law.

The logical results in cases involving " renvoi " may be classified as follows:

(1) If " renvoi " be a part of the New York law and not that of France, a New York court must apply New York internal or territorial law.

(2) If " renvoi " be a part of the laws both of New York and France, an endless oscillation between the conflict-of-laws rules of the two countries will be instituted, or a New York court must apply French internal or territorial law.

(3) If " renvoi " be no part of the New York law, even though it be a part of the law of France, a New York court will apply French internal or territorial law according to the provisions of section 47.

As I am of the opinion that the " renvoi " is no part of New York law, our case falls within the third class set forth above. The law of this state in regard to this theory will be considered, first, from the standpoint of principle, and, second, of authority.

To state accurately the problem in regard to the " renvoi " would seem almost sufficient to refute the doctrine. To quote Bate, Notes on the Doctrine of the Renvoi, page 47: " The naked question is that stated by Labbé (Clunet's Journal, 1885, p. 9): When a lawgiver abandons to a foreign system of law the determination of a legal question, does he ask this system to decide what law is applicable, or does he seek in this system the solution which the legal question ought to receive? "

As already stated, it is a part of the Anglo-Saxon jurisprudence that a will be construed according to the law of testator's domicile, and this principle is embodied in section 47 of the Decedent Estate Law. This is the New York rule on the conflict of laws in reference to this question. For a court to hold that the

legislature meant that the French conflict-of-laws rule is to apply the New York internal law to be enforced is to abrogate this provision of the statute, or to amend it by substituting therefor the French rule, namely, that the law of the nationality is to govern.

The " renvoi " doctrine is not supported by reason. It inconsistently requires either the application of internal New York law after the reference by the French law, although the first reference had been from New York to the French conflict-of-laws rule, or the endless reference back and forth which has been called *a circulus inextricabilis*.

It has been argued that the New York court should constitute itself a French court, the assumption being that it is charged with the administration and enforcement of French law in the same manner as a French court is charged. But this assumption is erroneous. The New York court was created and exists for the purpose of enforcing the New York law, including the state's own rules as to the conflict of laws. As well said by Judge Taschereau in *Ross* v. *Ross,* 25 Can. S. C. 307, 1894, at page 353, in reference to the holograph will of a domiciled citizen of Quebec, which was executed in New York and therefore invalid by the judge's view of the rule, *locus regit actum,* as a part of the law of Quebec: "And the New York Legislature had not the power to alter that law (*i. e.,* the rule of *locus regit actum*) for the Province of Quebec, and to decree that a Quebecer could in New York make his will either according to his *lex domicilii* or to the *lex loci actus,* or to neither one nor the other, but according to a mixture of both, at least so as to affect movables in Quebec. It cannot be that the legislature of New York had the right to pass a statute in the following terms: ' Whereas by the law of the Province of Quebec a holograph will made in New York by a citizen of the province is invalid in Quebec; whereas it is expedient to pro-

vide otherwise; it is hereby decreed that hereafter such a will shall be valid.' Could such an enactment affect property in Quebec? I would say not, and the legislature never intended to do so. To give to their statute the meaning that the respondent contends for would be to extend it in a manner not justified by any principle of law that I know of."

The most practical argument advanced in favor of the " renvoi " is that it would make for uniformity of decision amongst the different national courts called upon to pass upon the succession of a decedent owning movables in various states. Bentwich, The Law of Domicile in its Relation to Succession, pp. 182, 183. But this contention has, I think, been shown to be unsound in substantially all cases. See Bate, Notes on the Doctrine of the Renvoi, 31 Harvard Law Review and 10 Columbia Law Review.

The authorities in regard to the " renvoi " doctrine are hopelessly at odds. It is generally accepted as law in France and Belgium and has been approved in a number of cases in Germany and other continental states. It has been disapproved in Italy and Switzerland. The " renvoi " result has been reached in some cases which have arisen in England, but usually without discussion, and in many of them by lines of reasoning the logic of which is difficult to follow. Only one case, *Bremer* v. *Freeman,* 10 Moore P. C. 306, has reached an appellate court, and the decision in that case is claimed both as supporting and rejecting the " renvoi." The House of Lords has not yet been called on to pass upon the question. The English cases are collated and analyzed in Bate, *supra,* and 31 Harvard Law Review, *supra.* It is quite clear that as yet the " renvoi " is no fixed part of English law. In fact, in the case in which the facts are most nearly similar to the case at bar — *Hamilton* v. *Dallas,* L. R. 1 Ch. 257 (1875) — the "renvoi" was rejected

without mention or discussion. In that case an Englishman domiciled *de facto* in France, without the official authorization required by section 13 of the Code, left a will whose formal validity was not questioned. One of the legatees having predeceased the testator, there was a partial intestacy. The question was whether the next of kin were to be determined by French or English law. The property was personally in England. The court applied the law of France — *lex domicilii* — to determine the succession, referring thus to the internal law rather than to the conflict-of-laws rule and rejecting the " renvoi." This case has additional weight by reason of the fact that the decision deprived the English revenue authorities of legacy duty.

In 1894 the Supreme Court of Canada decided the case of *Ross* v. *Ross, supra,* by an application of the " renvoi " doctrine to the question of the formal validity of a holograph will of a citizen domiciled in Quebec who had executed the will in New York. There is no discussion of the doctrine in the majority opinion, and by far the most interesting part of the decision is the dissenting opinion of Judge Taschereau, from which I have already quoted.

My attention has not been called to any cases in the United States in which the doctrine is considered or discussed; 31 Harvard Law Review, p. 565 *et seq.,* collects all the cases in which the " renvoi " might have arisen or was involved. They are *Dupuy* v. *Wurtz,* 53 N. Y. 556; *Harral* v. *Harral,* 39 N. J. Eq. 279; *Lando* v. *Lando,* 112 Minn. 257; *Guernsey* v. *Imperial Bank of Canada,* 188 Fed. Repr. 300; *Bell* v. *Riggs,* 34 Okla. 834.

In *Harral* v. *Harral* the same result was reached, whether " renvoi " was accepted or not. The *Lando* case may be an application of the " renvoi," but its force is weakened by the lack of argument of the ques-

tion and the fact that the court was straining to
uphold the validity of a marriage. The *Guernsey* case,
if it supports "renvoi" at all, does it by way of
dictum, and the *Bell* case is rather against than in
favor of the doctrine. None of these cases affords
any clear light for the decision of the present case.

In *Dupuy* v. *Wurtz, supra,* there was a dictum of the
court to the effect that the will in question, which was
executed in France, was valid even if the testatrix
had been found to be domiciled in France, as French
law was not applicable to foreigners dying domiciled
in France without the Code authorization and as the
French courts would uphold the will if executed
according to New York law — both the "desiste-
ment" and the straight "renvoi" theories. But
this is clearly dictum, as the court expressly puts
aside these arguments and decides the case squarely
upon the ground that no domicile in France had been
established. Professor Loranzen sums the matter up as
follows (10 Columbia Law Review, p. 344) : "The *ren-
voi* doctrine is, therefore, no part of the Conflict of
Laws of the United States. Its introduction into our
law would be most unfortunate on account of the uncer-
tainty and confusion to which it would give rise in the
administration of justice and its demoralizing effect
upon the future development of the Conflict of Laws."

There is thus no authority which compels me to
apply the "renvoi" doctrine to the case at bar. The
way is unmarked in this state and should be deter-
mined in accordance with sound legal principles. On
account of its inconsistency with common-law theories
of the conflict of laws, its fundamental unsoundness
and the chaos which would result from its application
to the conflicts arising between the laws of the states
of this country, it is my opinion that the "renvoi"
has no place in our jurisprudence. In reaching this
conclusion I have not overlooked the very able opinion

of the expert, Dr. Huberich, on the question to be determined, but after a very careful consideration of this matter I cannot agree with his conclusions. I have therefore construed the law for myself. As was said by the Court of Appeals in *Knickerbocker Trust Co.* v. *Iselin,* 185 N. Y. 54, 58: " Proof of foreign law by experts, though ever so clear and though uncontradicted, is not conclusive, since the court must examine and determine the law for itself. * * * It is true that foreign law is ordinarily proved as a fact, still it is not in its essential nature a fact any more than domestic law is a fact.''

It therefore follows that, in accordance with the obvious meaning of the provisions of section 47 of the Decedent Estate Law, the New York court should apply the French internal or territorial law, *i. e.,* section 1044 of the French Civil Code as construed in the French cases cited above; that is, the legacy to Ida Bisland Williams accrues to that of the surviving legatee and the whole residuary estate passes to Mrs. Tallmadge and thence to her assignee.

The fact that the will was drawn in New York and executed according to New York law, and was not validly executed by French law, does not militate against this view, as the formal validity of the will is determined by section 23 of the Decedent Estate Law, regardless of the law of the domicile. See *Matter of Rubens,* 128 App. Div. 626; 195 N. Y. 527; *Matter of Cleveland, supra;* Fowler's Decedent Estate Law, 207.

Nor does *Dreyfus* v. *Lecoutourier,* Civil Tribunal of the Seine, 2d Div., 1st Sec., Aug. 10, 1908, the strongest case cited by contestant, seem to be against this view. In that case the question involved was whether the French court had jurisdiction of an action for an accounting and the liquidation and distribution of an estate, the Surrogates' Court of New York county having already rendered a decree admitting the will and a

codicil to probate. The testator, originally a French citizen, had become a naturalized American citizen. He had taken this step in defiance of the law of France, and therefore could not subsequently acquire a legal domicile in France without authorization from the French Government, although he was domiciled *de facto* in France. The court states that in the exceptional case of a person who can claim no nationality a domicile *de facto* is sufficient to determine the place where an estate is to be " opened "—meaning doubtless where the will is to be probated and the administration in chief is to be had. This exceptional rule was not to be applied to a *citizen* of a foreign state domiciled *de facto* in France. Consequently the distribution of the estate was to be governed not by French but by American law. The court therefore declined jurisdiction of the action. In other words, this is an application of the " desistement " theory, which has been already discussed and rejected.

In arriving at my decision I have not considered the apparent intention of the testator to cut off his brother from any share of his estate, as that intention is set forth in the two holographic documents — one found with the will and the other in his executor's possession — and also as it is indicated by the ten dollar legacy to his brother.

Report confirmed by order of the surrogate dated October 17, 1919.