**McCOMBS, Estate of, In Re.**

Probate Court, Montgomery County.

No. 104391.   Decided May 28, 1948.

354

Landis, Ferguson, Bieser & Greer, Dayton, for Ben Atkinson, Applicant.

Pickrel, Schaeffer & Ebeling, Dayton, for Peggy Crone McCombs, Administratrix with will annexed.

**OPINION**

By LOVE, J:

This cause came on to be heard upon the application of Ben Atkinson, legatee under the will of Melvorne J. McCombs, deceased, and independent executor of the estate of said decedent, appointed as such by the County Court of the County of Dallas, Texas, briefs of counsel, and the evidence.

The Court has before it a complete transcript of the evidence, it having previously ordered the same transcribed on its own motion.

A brief resume of the facts which gives rise to the litigation will be helpful in order to understand the legal questions which the Court must decide.

Melvorne J. McCombs died on July 28, 1945 in Cincinnati, Hamilton County, Ohio after a brief illness. He was President of the Buckeye Tools Corporation in Dayton, Ohio. He maintained a residence in Dayton, Ohio for approximately eight or nine years. He came here from Dallas, Texas but preserved a domicile there even after coming to Dayton to take over the management of the Buckeye Tools Corporation. This Court had previously found his domicile to be in Texas, as his holographic will and codicil were duly ordered probated by this Court under §§10504-15 and 10504-22 GC on August 24, 1945. The will in itself indicates the decedent's intention to retain Texas as his domicile as he provided:

"2—It is my will that, in as much as I have intentionally and carefully preserved my legal status as a citizen of the Corporate State of Texas during my entire lifetime, notwithstanding some temporary and indefinate sojurns from the territorial limits of the State of Texas—and have at all times evidenced such legal citizenship by public acclaim, by having fully my legal rights of political suffrage in the said State of Texas, by refraining from at any time registering for, or casting, any political votes or ballots in any other state or other political subdivision of these United States outside the said State of Texas, and by refraining from, at any time, claiming or accepting any rights of citizenship in any other State, or other political subdivision of these United States, other than the said State of Texas and the political subdivisions thereof; this last will and testament shall and will be probated, if and when same shall come to pass, in some court of competent jurisdiction in the said State of Texas, and nowhere else; and"

The decedent left his widow, Peggy Crone McCombs, and no other heirs at law or next of kin surviving who would have been entitled to notice of the hearing on the application to probate his will and codicil.

On application of his widow, the Court appointed her administratix with the will annexed on August 27, 1945. Her address was given as 62 Central Avenue, Dayton, Ohio, presumably the Dayton residence of Melvorne J. McCombs and his wife. On October 6, 1945 the administratrix with will annexed filed her inventory and appraisement which disclosed personal assets in this county amounting to $54,559.84. An exemption to the widow in the amount of $2500.00 in money was set off in lieu of property not deemed assets of the estate under §§10509-54 and 10509-55 GC. The appraisers allowed the widow for her year's support the sum of $7500.00. Included in the inventory and appraisement were 294 shares of common stock of the Buckeye Tools Corporation appraised at $50.00 per share for a total appraised value of $14,700.00. Said inventory and appraisement was approved by the Court on November 8, 1945.

On December 5, 1945 the widow filed an application in which she elected to purchase the Buckeye Tools Corporation stock at the appraised value as provided in §10509-89 GC. The value of the stock so elected was well within one-third of the gross appraised value of the estate at the appraised value as fixed by the appraisers. On January 3, 1946 the Court approved the election and authorized the transfer and conveyance of the stock to the widow at the appraised value and for cash.

The applicant, Ben Atkinson, was appointed independent executor of said estate in Texas on January 2, 1946. The decedent owned real estate and personal property in Texas. The codicil to the will gives a residuary estate to the following persons:

"a—½ to my dear wife, Peggy Crone McCombs, and
b—¼ to my dear sister, Nora McCombs Atkinson, and
c—¼ to my dear sister, Helen McCombs Overton"

The estate appears to be solvent both in Texas and in Ohio. The application of the independent executor was filed April 22, 1946. The only party upon whom notice was served was Peggy Crone McCombs, widow and administratrix with will annexed.

The manner in which this proceeding was brought merits some preliminary comment. The application of the independent Texas executor, Ben Atkinson, after a chronological narrative of the facts, makes the following prayer:

"Wherefore your applicant asks that, pending a final hearing, the Court forthwith grant a temporary order restraining said Peggy Crone McCombs from transferring or encumbering in any way said 297 shares of common stock of the Buckeye Tools Corporation and from performing any act as Administratrix herein, and that upon the hearing of this application upon its merits the Court order that said Peggy Crone McCombs be removed as such Administratrix and a proper and qualified person be appointed under proper and adequate bond; that said widow be ordered. to reconvey and transfer back to said estate said 294 shares of common stock of Buckeye Tools Corporation which she attempted to purchase and the 3 additional shares purchased for decedent by said Reeves, as well as any assets or money transferred or paid to her as property exempt from administration or for a year's allowance; that the appraisal of said stock be vacated and set aside as manifestly inadequate and made through mistake and without full knowledge of the facts; that a new appraisal be made and for such other and further relief as may be proper in law or at equity."

All matters pertaining to applicant's request for a temporary restraining order were disposed of before the trial on the merits.

As is evidenced from the prayer and the allegations in the application which are too long to set forth, this action is

a combination of several different proceedings; namely, an application for the removal of the administratrix with will annexed under §§10506-74 and 10509-19 GC; and application to vacate the year's allowance set off by the appraisers under §§10509-74 and 10509-75 GC, and the statutory exemptions set off under §§10509-54 and 10509-55 GC; an application to vacate certain judgments of the Court on the ground that the Court lacked jurisdiction to make the orders; exceptions to the inventory and appraisement under §10509-59 GC; an application to vacate certain judgments of the Court under Section 11631 et seq; a petition for a declaratory judgment under Sections 12102-1 et seq; and a complaint of concealment of assets under Section 10506-67 et seq. Since no motion or pleading was filed by the opposing party to separate causes of action in order to clarify the issues and no objection was made at the trial, the Court for itself will have to determine the extent of the relief to be granted by an examination of the application in the light of the evidence. It must be admitted that this unorthodox manner of procedure has made it very difficult for the Court to evaluate all of the evidence and to arrive at a decision. It appears that the following questions must be decided: (1) whether the widow is entitled to a statutory exemption in the personal estate of her non-resident deceased husband; (2) whether the widow is entitled to a year's allowance out of the personal estate of her non-resident deceased husband; (3) whether the widow was entitled to elect and purchase certain stocks at the appraised value under §10509-89 GC; (4) whether the approval of the inventory and appraisement should be vacated and set aside because of fraud or mistake and concealment of assets and a reappraisal ordered; (5) whether the administratrix should be removed; and (6) what are the rights of the widow as to (a) the $5,000.00 "gratuity" from the Buckeye Tools Corporation to such relict in recognition of the husband's services to such corporation; (b) the joint bank accounts in the name of Peggy Crone McCombs and her deceased spouse, and (c) the rights of the litigants in four shares of Buckeye Tools Corporation stock purchased by one Reeves. (Note: The application alleges three shares purchased, but the evidence discloses that four shares were purchased.)

It should be stated at the outset that the case has been approached from the position that the decedent and his wife, the administratrix with will annexed herein, were domiciled in Texas on the date of his death. Realizing that domicile and residence, when used in the legal sense, are not always

synonymous, it is clear that the general rule relative to a married woman's domicile holds that the wife's domicile is the same as that of her husband when the parties are living together as husband and wife. See Restatement—Law of Conflicts, pages 50 and 51; **14 O. Jur., pages 579 and 580;** 17 Am. Jur., pages 614 and 615, Domicile, Section 38. For a recent case which holds that domicile and residence are not synonymous, see **State Ex Rel. Overleander v. Bremer, 147 Oh St 386, 34 O. O. 338, 72 N. E. (2d) 84.** Domicile as used in §10504-15 GC and residence as used in §10509-1 GC were distinguished. No issue has been made of the domicile of the surviving wife, nor have any facts been presented which would take the case from under the general rule. Mrs. McCombs' testimony on this phase of the case was as follows:

"* * * Also, due to the fact this is my home. I intend to make it my home and I feel sure the Colonel would have continued to make his home here. I felt this is the place I am going to be and this could be the place. According to Ohio law I could open it here, and they said if I did not, they would."

Since the deceased emphatically intended never to become a resident of Ohio but to continue his Texas residence, the rights of his wife are also determined on the basis that her domicile was the same as that of her husband.

As a preliminary to answering the questions propounded, it is necessary to examine the applicable principles of private international law so that the effect of the Ohio statutes may be properly evaluated. By the overwhelming weight of authority, in the absence of a statutory provision, the rights of a relict in the estate of her deceased consort in an estate consisting of personalty are determined by the law of the decedent's domicile. In Restatement—Conflict of Laws, Section 461, the following statement appears:

"Whether a widow is entitled to a temporary allowance at the death of her husband depends upon the law of the state where he died domiciled. If the law of that state does not provide for such an allowance, it is immaterial that the widow has a separate domicile in a state under the law of which she would be entitled to the allowance."

In Beale—Conflict of Laws, Vol. 2, Section 301.1, the following appears:

"Widow's Allowance.—It is common by statute to provide that a widow shall be granted a certain amount, or an amount fixed by the court, in preference to either creditors or successors. Such a law, it is held, is applicable only to a widow whose husband was domiciled within the state at the time of his death.

"A widow not domiciled in the state at the time of her husband's death is not entitled to the benefit of the law, though she is there domiciled at the time of application."

In Section 302.1 of the same work the following appears:

"Enforcement in Another State.—An allowance can be granted only by a court in the state of domicile of the husband at the time of his death."

In 11 L. R. A. (NS) 361 appears the following:

"* * * and in such situation the well-established principle of private international law, that the distribution of the personal estate of a decedent is governed by the law of his domicil, is allowed to control. Accordingly, the cases very generally hold that the widow of a decedent, who, at the time of his death was domiciled in another state, is not entitled to the allowance or exemption provided by the local statute, out of the assets found within the state,—at least if the widow was also a nonresident of the latter state at the time of her husband's death."

The editors in 88 A. L. R. 862, basing the rule on decisions from numerous states, state the rule as follows:

"Accordingly, * * * such right of the survivor or in the estate of the deceased spouse must be governed, in the case of personal property, by the law of the state in which the deceased spouse had his or her domicil at the time of death, and in the case of real property, by the law of the state of its situs, to the exclusion of every other law."

See also 11 Am Jur., Conflict of Laws, Sec. 92, page 379; Story, Conflict of Laws, 7th Ed., Sec. 471 et seq; and 32 O. Jur., Private International Law, Sec. 105, page 339. Equally as well settled as the foregoing is the rule as stated in 11 Am. Jur., Conflict of Laws, Sec. 65, page 352.

"The dominion of a state over personal property within its border is complete, and its right to regulate its trans-

fer and subject it to process and execution in its own way and by its own laws is unquestioned; and only so far as the comity of that state allows can such property be affected by the law of any other state.".

See also 11 L. R. A. (NS), supra; Story on Conflict of Laws, '7th Ed., Sections 20.II and 23.III; 32 **O. Jur.**, Private International Law, Sec. 101, page 329; **Re Estate of Crawford, 68 Oh St 58 at page 82,** 96 Am. St. Rep. 648; 67 N. E. 156. It is clear therefore that this state has the power and authority to effectively change the applicable private international common law. The question becomes: to what extent has Ohio effected such changes?

**Sec. 10504-15, GC,** as amended effective September 20, 1943, provides:

"A will shall be admitted to probate;
* * *
"2. If the testator was not domiciled in this state at the time of his death, in any county of this state where any real or personal property of such testator is located, provided, however, that such will shall not theretofore have been admitted to probate in this state or in the state of his domicile. * * *""

The Committee on Probate and Trust Law of the Ohio State Bar Association prepared comments on the purpose of amending §§10504-15, 10504-22, and **10509-1 GC** which are set forth in part as follows:

"If the testator is domiciled in this state at the time of death, his will must be probated in the county of domicile.

"If the testator is not domiciled in this state at the time of death, his will may be probated in any county of this state where any of his real or personal property is located. **This provision permits original probate in this state of the will of a nonresident decedent. The Ohio administration will be the principal administration, and administration in any other state will be ancillary to the principal administration.**

"The will cannot be probated in one county if it previously has been probated in another county within the state or in the state of the testator's domicile. **In a case where the will has previously been probated in the state of the testator's domicile, the Ohio administration will be an ancillary administration and will be governed by Sections 10511-1 and following:**

"As the will of the non-resident must be probated in a

county where property of the testator is located, this section defines the situs of intangible personal property for such purpose. * * *

"While the Committee believes that the 1943 amendment will be helpful in many cases, it should be recognized, in a case where a portion of the property of the testator is located in another state, that counsel must consider the law of such state and the problems arising in the administration of the property within such state, before proceeding under this section. Similar statutes are in effect in New York and several other states." (Emphasis supplied.)

See Addams & Hosford, Ohio Probate Practice and Procedure, 1947 Cumulative Supplement to Third Edition, pages 118 and 119 following §10504-15 GC.

On page 120 of the aforesaid Supplement following §10504-22 GC, the Committee Comment is:

"* * * The 1943 revision of this section was made necessary by reason of the amendment of §10504-15 GC, permitting original probate in this state of the will of a non-resident decedent." (Emphasis ours.)

Sec. 10504-22 GC, provides:

"If it appears that such will was duly attested and executed, according to the law in force at the time of execution in the state where executed or according to the law in force at the time of death in this state or in the state where the testator was domiciled at the time of his death, and that the testator at the time of executing it was of full age, of sound mind and memory, and not under restraint, the court shall admit the will to probate." (Eff. Sept. 20, 1943.)

After §10509-1 GC of the same work at page 164 the Committee Comment was:

"The 1943 revision of this section was made necessary by reason of the amendment of §10504-15 GC, permitting original probate in this state of the will of a non-resident decedent." (Emphasis ours.)

Sec. 10509-1 GC, provides:

"Upon the death of a resident of this state, intestate, letters of administration of his estate shall be granted by the probate court of the county in which he was a resident at the time he died.

"If the will of any person is admitted to probate in this state, letters testamentary or of administration shall be granted by the probate court in which such will was admitted to probate." (Eff. Sept. 20, 1943.)

While written statements of the members of the legislative committee and of the committee of the Ohio Bar sponsoring legislation are to be accorded great weight, they are not conclusive of legislative intent. See **Neff v. Cleveland Trust Co., 21 O. O. 461.**

At pages 19 and 27 of the brief of the administratrix with will annexed submitted in connection herewith, it is argued at length that:

"* * * the legislature of Ohio has spoken on this subject, and has preempted a field where some doubt and confusion has heretofore existed. * * *

"* * * The Probate Court Committee emphasized that the **administration,** not the probate, in Ohio, will be the **principal administration,** and that the **administration,** not the probate, in Texas, will be the ancillary **administration.** * * *

"Across the whole length and breadth of this country, the States of this Union have been applying their own laws, rules and regulations in the **administration** and **procedure** for the settlement of estates of decedents, whether resident or non-resident, on all assets located in their jurisdiction."

Without attempting to make a complete and exhaustive survey of the comparable law and statutes of all the states, the Court did examine the comparable legislation of many states; and, among others, the following have statutes which provide for the original probate of wills of non-residents which have been the subject of judicial construction.

In New York the appropriate statute, Decedent Estate Law, Section 23, is as follows:

"A will of real or personal property, executed as prescribed by the laws of the state, or a will of real or personal property executed without the state in the mode prescribed by the law, either of the place where executed or of the testator's domicile, * * * may be admittted to probate in this state." (Eff. May 3, 1919.)

In Re Bleicher's Estate (1931), 142 Misc. (N. Y.) 549, 255 N. Y. S. 368, the court held that the widow of a decedent dying domiciled in New York was not entitled under the law of Pennsylvania to the statutory exemption allowance out of

the personal property of the deceased in Pennsylvania because the distribution of the deceased's personal property was governed by the law of the state of his domicile at the time of his death.

In Massachusetts the following statute seems to be applicable. Chapter 215, Section 3, provides:

"Probate courts shall have jurisdiction of probate of wills, of granting administration on the estates of persons who at the time of their decease were inhabitants of or residents in their respective counties and of persons who die out of the commonwealth leaving estate to be administered within their respective counties; * * * (* * * 1922, 532 Sec. 7; 542 Sec. 2)"

The statute is a substantial re-enactment of the St. of 1817, c. 190, Secs. 1, 16. In Shannon v. White, 1872, 109 Mass. 146, the court said that any rights of succession in or allowance out of his (the decedent's) personal property must be regulated by the laws of Indiana (where the decedent died domiciled in Indiana), and there is nothing in the case to show that by those laws his widow can claim any part thereof as against his will giving it all to other persons.

In Illinois see Sections 10 and 11 of the Wills Act of 1872, now Smith-Hurd Ann. St. 1941, Chapter 3, Sections 206 and 207, which provide for probate of wills made out of the state in any county in Illinois where testator owned realty and if no realty, in which he owned personalty. The purpose of Section 10 of the Wills Act was set out in Martin v. Central Trust Company (1927) 159 N. E. 312, 327 Ill. 622 at page 633:

"* * * was evidently passed for the sole purpose of further protecting local creditors living in this State in the collection of their debts against non-resident deceased debtors. It was not passed with a view of compelling administration of estates of nonresidents by executors or administrators in cases where the non-residents owe no debt in this state and where such administration is unnecessary."

In Indiana the applicable statute provides for the probate of wills in any county in which assets are located. See Hofferd Admr. v. Coyle Exr., 212 Ind. 520, 8 N. E. (2d) 827, which held that this section is merely declaratory of the common law.

Deering's Civil Procedure and Probate Codes of California, Div. 3, Chap. 1, Art. 1, Section 301 (3), enacted in 1931, pro-

vides for probate of wills in the county where assets are located. Also see Sec. 362. In Re O'Connor's Estate (1933), 218 California 518, 23 Pac. (2d) 1031, the court held that the interest of a wife in the estate of her husband is determined by the law of the state in which he has established a separate domicile at the time of his death.

It must be concluded therefore that, if the decisions from other states across the breadth of the land can be used as a guide, the common law has not been changed nor has the legislature preempted the field by the provisions made for original probate of the wills of non-residents. How then, should the Ohio statute be interpreted? A very ancient but still accurate rule is stated in Sutherland's Statutory Construction, 3rd Edition, Vol. 3, Section 5505, page 41, note one:

"Probably the best approach is found in Heydon's Case, 3 Co. Rep. 7s, 76 Eng. Rep. 637 (Ex. 1584), where it was stated, 'and it was resolved by them, that for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered:—

" '1st. What was the common law before the making of the Act.

" '2nd. What was the mischief and defect for which the common law did not provide.

" '3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the Commonwealth.

" 'And, 4th. The true reason of the remedy.' "

The common law being clear, it becomes pertinent to determine what the "mischief and defect" was in the former statutes which have since been amended.

According to the provisions of §10504-15 GC prior to the amendment of September 20, 1943, domicile in the county was a prerequisite to the probate of a will; all wills in order to be probated in Ohio had to be executed in accordance with the laws of Ohio before the amendment to §10504-22 GC; and the probate court had no jurisdiction to appoint a fiduciary for a non-resident person dying testate until §10509-1 GC was amended except under the sections dealing with ancillary administration. (See Section 10511-1 et seq). Even though a person died with assets in this state, with creditors in this state, and his will in the custody of persons in this state, it was nevertheless necessary to proceed with the original pro-

bate in the state of domicile. Upon presenting an authenticated copy of the will and order of probate from testator's domicile as provided in §10511-5 and §10511-6 GC, the appointment of an ancillary administrator with will annexed or an executor would then have been in order in this state. (See §10511-10 GC.) This was always required even though there were no assets nor creditors in the state of domicile which would require the probate of the will and the administration of the estate. It seems logical that this was the "mischief and defect" which was being remedied by the enactment of the amendment to §§10504-15 and 10504-22 GC.

In providing the remedy for the "defect," the legislature merely provided for original probate in this state when assets are located here. And, in order to establish a procedure to administer the estate originally in this state, the legislature amended §10509-1 GC, effective September 20, 1943, in order to empower the probate court to appoint a fiduciary to administer the Ohio property in any such case where the will of a person domiciled in another state could be admitted to probate originally in a county of this state. In other words, the Ohio legislature adopted a procedural law which accomplished in testate cases that which had been the law since January 1, 1932 as to nonresidents dying intestate where there had been no domiciliary administration. (See §10511-13, GC, which is in para materia with §10511-12 GC, and the other applicable sections in said chapter.) The amended sections disclose that the plan of the legislature previously adopted has been extended to testate cases. See §10511-12 GC which refers back to the sections of the probate code dealing with the administration of estates of resident decedents. Also see §§10511-13 and 10511-14 GC, which disclose a similar intent. A careful study of these sections discloses that Ohio has for the most part retained the general principles of private international law as it pertains to personal property and real estate located in Ohio belonging to a non-resident decedent. Now what is the effect of the amendments to the sections under examination? Do they change the common law rule that the domicile of the decedent controls the interest of the relict in the personal property? The rule that statutes in derogation of the common law must be strictly construed has been abolished by the provisions of §10214 GC, insofar as the rule pertains to the probate code, and the same statute provides that all provisions "shall be liberally construed." What this means has been summarized by Judge Wanamaker in **State, ex rel. Maher v. Baker, 88 Oh St 165 at page 172:**

"The strict construction * * * must not squeeze out the life-blood of the statute, nor should the liberal construction result in the exercise of the legislative power of amendment under the mask of so-called interpretation. In short, it is not the proper province of the court to add to or subtract from the intended meaning and scope of the statute. In any case, the interpretation should be reasonable, consistent with the language used, and conducive to the purposes to be accomplished by the enactment of the statute."

Granting that the provisions of the probate code must be liberally construed and that the legislature intended to provide for original probate and administration, it seems clear that the legislature did not intend by virtue of the amendments to §§10504-15, 10504-22 and 10509-1 GC to effectuate any other sweeping change in the law as it formerly existed and that to read into the amended sections such an intention would "result in the exercise of the legislative power of amendment under the mask of so-called interpretation." Those matters relating to substantive rights in personal property are still controlled by the law of the state of the decedent's domicile; and the legislature, by its amendments, merely subjected such assets to the statutory rules of procedure provided for the probate courts of Ohio.

A close examination of the Committee Comments quoted above supports this conclusion. Giving the comments the weight to which they are entitled does not support a contention that the Ohio legislature intended to change the Ohio law respecting personal property in this state owned by a non-resident decedent. It seems clear that a careful study of every phrase and word used in these amended sections and the fact that the legislature adopted a similar plan already in use (Section 10511-1 et seq) indicate without question the legislative intent when the words in said statutes are given their common and ordinary accepted meaning as the words are commonly used in the probate code. See Syllabus 5, **Wachendorf v. Shaver, 149 Oh St 231, 36 O. O. 554.**

That the Ohio legislature did not intend to change the common law rule under discussion is strengthened by another very pertinent argument: that laws passed in complete disregard of well recognized rules of comity may react unfavorably to residents of this state who die owning property in other states. One can well imagine other legislatures passing retaliatory legislation if Ohio had preempted this field. The Committee even warns the Bar to use the amended statutes discreetly, having in mind no doubt the many legal and tax

complications which might arise. In New York the common law rule was adopted as a statutory rule (see Decedent Estate Law, Sec. 47) no doubt as an assurance to other states that the well known rules of comity would be recognized. The courts have held that the aforesaid statute is declaratory of the common law. See Matter of .Chadwick, (1919), 109 Misc. 696, 181 N. Y. S. 336.

Turning again .to the first question propounded, the Court must determine whether the widow of the Texas decedent is entitled to the property exempt from administration under §§10509-54 and 10509-55 GC. Sec. 10509-54 GC in and of itself is not determinative of the question since it merely provides "when a person dies * * *" and is silent on the question of domicile or residence. The surviving spouse contends that the exemption and the year's allowance have been held to be claims or debts of the estate and the allowance thereof "in construed as adjective—procedural" and cites as authority the Surrogate Court case of Kapp v. The Public Administrator, 2 Bradf. 258 (N. Y.). Little weight can be given the holding in this case in view of the great weight of authority to the contrary and particularly in view of the decision of In Re Bleicher, supra, and also in 11 L. R. A. (NS) 362 (note) appears the following comment:

"The only case, other than Jones v. Layne, in which a statute, not explicit as to the effect of the decedent's nonresidence, providing for an allowance in favor of a widow out of the personal assets, has been held to apply to the widow of one who was a nonresident at the time of his death, appears to be Kapp v. Public Administrator, 2 Bradf. 258 (a surrogate's decision), * * *"

Admitting that the relict's claims against her deceased consort's estate have been held to be debts of the estate, if there is no substantive **right** existing in favor of such relict which would **create** the debts, there is no claim to be classified adjectively. The Court for the reasons hereinbefore stated is compelled to follow the well established doctrine supported by the overwhelming weight of authority that any right of the relict to a statutory exemption in her deceased consort's personal property is a substantive right and must be determined by the law of the decedent's domicile. For this Court to formulate a new approach which would stand at variance with a principle so well established and so universally applied would certainly produce uncertainty sooner or later and be conducive of evil consequences. The Court therefore holds that the surviving spouse is not entitled to

any property exempt from administration under the provisions of §§10504-54 and 10504-55 GC. It is this Court's opinion that said sections are self-executing in favor of a surviving spouse of a decedent domiciled in this state but that they do not extend to the surviving spouse of a non-resident decedent who dies owning personal property in Ohio. Wherefore, the order approving the inventory is modified and the exemption set forth in Schedule F is ordered stricken. It is to be noted that the Court in these proceedings has not been called upon to decide the question of the spouse's right to an exemption where her non-resident husband died seized of real estate located in Ohio as the inventory and appraisement discloses that the decedent owned no real estate in this state.

The second question to be considered concerns the right of the widow to a year's allowance out of the personal property located in this state under §§10509-74 and 10509-75 GC, or, if these sections are not applicable, under §10509-78 GC.

An examination of these sections indicates quite clearly that §§10509-74 and 10509-75 GC do not create a right in favor of a widow of a non-resident decedent; therefore, the appraisers were without authority to set off a year's allowance as disclosed in the inventory and appraisement, and the Court was without jurisdiction to approve the inventory and appraisement with the year's allowance fixed by the appraisers. Accordingly the inventory and appraisement order is modified by striking the year's allowance for the same reasons applicable to the statutory exemption decided above.

While the following section apparently contemplates that an ex parte application should be filed, the applicant's allegations as to the year's allowance, when considered in light of the proof, are sufficient to bring before the Court the issue of whether or not the widow is entitled to a year's allowance under §10509-78 GC, which provides:

"**When a non-resident decedent leaves property in Ohio,** the probate court of any county in which the property or any part of it is located, in its discretion and on satisfactory showing as to the circumstances of the case, may set off a year's allowance to such decedent's widow and children; **provided, however, that no such allowance shall be set off if the laws of the state of decedent's residence make provision for year's allowance for widows and children of resident decedents.** The year's allowance so set off shall be a charge on the Ohio real estate of such decedent located within the county in which such allowance was made, or in any other county in the probate court of which a transcript of

the proceedings relating to the setting off of such allowance has been filed." (Emphasis ours.)

The statute makes the provisions applicable to a "non-resident decedent." While it might be argued that the decedent in the case at bar does not come within such classification since he maintained a 'residence" in Montgomery County (as distinguished from "domicile"), nevertheless the Court is of the opinion that the provisions apply equally to persons having their abode here but domiciled in another state and that the term "non-resident" includes all those persons not domiciled within the state.

In **14 O. Jur., Domicil, Sec. 8, page 567,** the problem is stated as follows:

"In General.—The problem of distinguishing the terms 'domicil' and 'residence' presents some difficulty. 'Residence' is the favorite term employed by the American legislator to express the connection between person and place, its exact signification being left to construction, to be determined from the context and the apparent object to be attained by the enactment. Questions as to the correspondence or difference in meaning between the terms 'residence' and 'domicil' are referable generally to the wording and purpose of the statutes in which they are used, in some of which, and for certain purposes, the words are distinguished, while in others they are regarded as synonymous."

And in Sec. 10, page 568, it is stated:

" 'Residence' and 'Domicil' as Synonymous Terms.—Although the terms 'domicil' and 'residence,' when used in a technical, legal sense, are not convertible, when used in a loose, general way they may be construed as synonymous."

It appears quite clear that the above statute is intended to include as non-residents those persons who do not have their domicile here.

Next it must be noted that §10508-78 GC requires that the allowance be set off by the "probate court"; whereas in §10509-74 GC applicable to resident decedents, it is provided, "The probate judge shall have authority to fix the year's allowance if the appraisers fail to do so, * * *" There is no ambiguity in this portion of §10509-78 GC; the phraseology "* * * the probate court * * * in its discretion * * * may set off a year's allowance * * *" is plain and unambiguous and conveys a clear and definite requirement that, as to

cases within the purview of this section, the probate judge in the exercise of his discretion **may** fix such allowance but, if it is set off at all, it must be done by him and not the appraisers. The difference in the wording of the two sections above referred to strengthens this conclusion. For this additional reason the Court must hold that the action of the appraisers in the case at bar was completely unauthorized.

We come now to the crux of the question which is the interpretation of the words in the statute which limit the discretion of the court:

"* * * provided, however, that no such allowance shall be set off if the laws of the state of decedent's residence **make provision for** year's allowance for widows and children of resident decedents."

Texas has enacted the following statutes. See 9 Vernon's Texas Statutes, Title 54, Chapter 16.

"Art. 3476. Within twelve (12) months after the original grant of letters testamentary or of administration, the court shall fix an allowance for the support of the widow and minor children of the deceased."

"Art. 3477. Such allowance shall be of an amount sufficient for the maintenance of such widow and minor children for one year * * *"

"Art. 3478. No such allowance shall be made for the widow when she has separate property adequate to her maintenance; nor shall such allowance be made for the minor children when they have property in their own right adequate to their maintenance."

The evidence discloses that Peggy Crone McCombs has an independent estate and income adequate to maintain her.

The Court must now determine the meaning of the phrase "make provision for" as used by the legislative body in §10509-78 GC. An examination of the works of lexicographers gives little assistance but does show that the words "provide" and "provision" are customarily used in various ways.

First, the phrase may be used in the sense of anticipating or forseeing a future occurrence; and, when so used, any provision made either benevolent or malevolent would nevertheless forsee such occurrence and "make provision" therefor. The applicant herein contends that a doctrine based on this line of reasoning should be adopted and states in his reply brief at page 12:

"Texas does make an allowance 9 Vernon's Texas Statutes Title 54, Chap, 16, Art. 3477 and the mere fact that Mrs. McCombs doesn't come within its provisions doesn't change that or make the Ohio statute apply to her."

Projecting this argument to its logical extreme, if the Texas statute simply disqualified all widows and children, it would nevertheless "make provision for" such persons in the same way that a statute which qualifies "poor" widows and disqualifies "rich" widows makes provisions for such "rich" widows. In other words, the fact that the law of Texas, as it presently exists, anticipates the survival of a spouse and children automatically "makes provision for" such persons even though the provisions are malevolent.

A second possible use of this phrase would be in a benevolent sense only: that no provision has been made for such widows and children if the laws of the state of domicile do not actually grant to such persons an allowance **simply because they are the surviving spouse or the minor children of the decedent;** that as soon as this right is abridged and curtailed by further restrictive qualifications of wealth, color, age, etc. so that their entitlement to this allowance is doubtful, provision has not necessarily been made and, as a consequence, the allowance in Ohio may be granted under the terms of the statute.

When the law was passed by the General Assembly, it was quite evidently intended to extend the protection of Ohio laws insofar as such laws apply to year's allowance to widows of nonresident decedents when the probate court in the exercise of its sound discretion decided such action was warranted. In the construction of laws relating to humane policies a liberal construction should be given by the courts. See **37 O. Jur., Statutes, Sec. 415, page 737**:

"Statutes enacted in Ohio for the protection of human life, or statutes of equitable character and beneficent tendency, or statutes granting a valuable right and grounded upon principles of a humane public policy, have been given a liberal construction by the courts. * * *"

In Crawford's Statutory Construction, Sec. 212, Public Policy, page 371, it is said:

"In spite of authority to the contrary, the general policy of the state, or the established policy of the legislature as

revealed by its legislation generally, should be considered in the construction of statutes. The view opposed to this principle is based upon the premise that public policy is too unstable a ground upon which to rely in the interpretation of statutes. While this argument carries considerable weight, and although it be admitted that public policy should not be a controlling consideration or perhaps entitled to great weight, where doubt exists regarding the meaning of a statute, rather than to allow a miscarriage of the intention of the legislature when that intention is in fact ascertainable, it would seem proper for the court to give the general policy of the state some consideration. * * *"

We are therefore twice admonished to liberally construe this statute; first, by §10214 GC and next by the rules of statutory construction applicable to all our statutes.

This Court cannot but believe that the intention of the legislature was to disqualify nonresident widows or minor children only when there exists in the state of domicile a benevolent law giving to all such persons the right to an allowance; that a statute which gives to one-fourth or three-fourths or any other percentage of such families such an allowance or a law that creates the right conditioned on wealth, color, age, belief, or some other state of facts which must be proved in the courts of that state does not make provision for such persons within the meaning of the Ohio statute. Any contrary holding would be a strict construction of this statute, not a liberal one. The Court is therefore of the opinion that the laws of Texas have not made "provision for" widows and minor children as contemplated by the Ohio legislature.

The last point to be considered in connection with the second question concerns the procedure to fix such a year's allowance. As pointed out before, it is believed the statute contemplates an ex parte application to the court to fix such allowance. This action was not taken herein. The express requirements of the statute are not so restrictive however and provide that the allowance may be set off "on satisfactory showing as to the circumstances of the case." During the trial of the case considerable testimony was taken in regard to the year's allowance, and on page 193 of the transcript appears the following uncontroverted testimony of Peggy Crone McCombs, the surviving spouse:

"Q. Now, the question was raised about the amount allowed the widow, it has been testified that the Colonel

had a salary of $25,000, and bonus checks run eleven thousand, in excess of it, just tell us the way you lived, your station in life?

"A. Well, we maintained a very nice home, and had a maid permanently. We were members of the Miami Valley Golf Club. We travelled extensively. We were gone most of the time, California, New York, Washington, just about every place, and we lived well. I don't know how to say further than that other than we lived according to the man's salary, a man who makes twenty-five thousand dollars a year, we lived accordingly. You can draw your own opinion. We travelled extensively, we maintained a nice home, and we were also members of a club. We had two cars and we had a permanent maid.

"Q. Entertain?

"A. Yes, extensively at our home and at the club.

"Q. What would you say about the sum of $7500. as to whether it was adequate, excessive or inadequate to maintain and support you for one year following the Colonel's death in the same manner, way of life, in which you had lived with him?

"A. I don't think it would be in excess, I think it would be just right."

Wherefore, the Court sets off to the widow the sum of $7500.00 as and for her year's allowance, the same to be paid out of the personal assets of the decedent in Ohio.

The third question to be considered by the Court involves the right of the Texas widow of the Texas decedent to elect and purchase at the appraised value common stock of an Ohio close corporation where the original probate and administration of the estate is in Ohio.

The Court in deciding other points in this opinion has decided that the label of "original" in the probate of wills and the administration of estates of non-residents does not change the lex domicilii pertaining to personal property either by any intention to do so or by preempting the field. Furthermore, the Court has also set out the applicable common law to the effect that the substantive rights are those existing in favor of such surviving spouse in the personal property of the decedent at the decedent's domicile and that the adjective remedies are determined by the law of the state wherein the administration proceedings are being pursued. Accordingly the question resolves itself into a decision of whether the right of a surviving spouse to elect to purchase personal property at the appraised value is "right" or "remedy," "substantive" or "procedural."

Courts generally agree in defining the terms "substantive" and "adjective" that "substantive" law creates, defines, and regulates rights as opposed to "adjective" or "procedural" law which provides the method of enforcing and protecting such duties, rights, and obligations as are created by substantive laws. Words and Phrases, Vol 2, page 392, and Vol. 40, page 524; Cyclopedic Law Dictionary, Third Ed., page 1066. While the definition is simple, to apply it is not; as is stated in Cyclopedic Law Dictionary, supra, "The exact boundary between the two is difficult of definition, * * *" The Court has been favored by exhaustive and able briefs from the parties herein, and neither they nor the Court have been able to find a case where the identical question has arisen. The question seems to be one of first impression.

Considering the purchase as a remedy, it can be quite logically argued that the change of the assets of the estate into cash by a sale to the surviving spouse is simply a method of enforcing the right of **administration** of estates. In other words, the administration is the right, and the procedures by which this can be accomplished are adjective law. This is in effect the contention of the administratrix. The applicant herein argues that the right given "relates not to the administration but to the distribution of the estate, is a matter of substance * * *" and hence is a substantive right, not applicable to a widow of a Texas decedent.

The right of a relict, whether a fiduciary or not, to elect to purchase real or personal property of a decedent at the appraised value is comparatively new to the body of our jurisprudence.

**Sec. 10509-89 GC**, in its present form accomplishes the following: (1) creates the right (substantive) and (2) also provides for the procedure—the method of acquiring it (adjective). The statute insofar as applicable to the kind of personal property under scrutiny reads as follows:

"At any time within one month after the approval of the inventory, the surviving spouse, if any, whether acting as executor or administrator, or not, shall have the **right to** purchase the following property, **if left by the decedent and if not specifically devised or bequeathed:**
* * *

"(c) **Any other** real or **personal property of the decedent,** not exceeding, with the mansion house and land used in conjunction therewith and such household goods **as the spouse may elect to purchase,** one-third of the gross appraised value of the estate, at the appraised value as fixed by the appraisers." (Emphasis ours.)

The above creates the right—substantive.

"**A spouse** so electing **shall file** in the probate court **a schedule of the personal property so desired.** * * * On hearing, the finding of the court shall be in favor of such surviving spouse unless it appears that the appraisement was made as a result of collusion or fraud or that it is so manifestly inadequate that a sale at such price would unconscionably prejudice the rights of the defendants or creditors, and the action of the court shall not be held to prejudice the rights of lien holders.

"Upon the filing of such schedule, * * * the court shall make an entry fixing the terms and conditions of payment for such property having due regard for the rights of creditors of the estate, and ordering the executor or administrator, or a commissioner who may be appointed and authorized for the purpose, to transfer and convey such property to such spouse upon compliance with the terms and conditions fixed by the court. The executor or administrator, or such commissioner, shall thereupon execute and deliver to the spouse a proper bill of sale * * * for such property, and make a return thereof to the probate court." (Emphasis ours.)

The last two paragraphs provide the procedure—adjective.

In the absence of the above statute no right would exist. In such a case an Ohio spouse would be required to receive her undivided share of estate assets upon distribution as provided by law or the will governing distribution. In the instant case the spouse receives one-half the residuary estate and the decedent's sisters each one-fourth. An Ohio spouse, by exercising her right under the statute, could obtain assets which would be quite advantageous to her. For example, she might gain control over a corporation by electing and purchasing her deceased husband's stock which would provide future benefits whereas, if the right had not existed, the control would be distributed among all of those persons entitled to the distribution of the stock. The advantages are so great, the benefits so well known in our system of jurisprudence that there can be little question that distribution is decidedly affected in most cases as it is in the case at bar. The fact that a specific bequest of property precludes the enjoyment of the right indicates how closely the right is related to distribution. Such a statute creates and gives the surviving spouse advantages not enjoyed by others whether there be a will or not. It seems a logical conclusion therefore that the **right** which is being asserted is the **right to elect to purchase** the property at the appraised value and that

the method of acquiring the property by purchase is the procedure rather than that the **right is of administration** and the election and purchase merely the method of administering. In a very recently reported case, **In Re: Estate of Burgeon, 81 Oh Ap 370,** reported in the May 24, 1948 issue of the Ohio Bar, the Court of Appeals of Henry County, at page 371 referring to §10509-89 GC as said section applies to real estate, made this statement:

"The privilege of a surviving spouse to elect to take the mansion house at the appraised value is a valuable right granted by the Legislature. This right may not be denied by the court unless the surviving spouse has voluntarily relinquished the right, or by some act is estopped from asserting the right."

If said section grants a right to the spouse to elect the mansion house, certainly the right granted under the same section to elect to purchase stock is also a valuable right granted to the spouse by the Legislature and must be considered by this Court as substantive law. There being no such right created under the law of Texas to the widow, the law being substantive in nature, the Court was without jurisdiction to approve the election under §10509-89 GC, and to order the same transferred and conveyed to the widow; therefore, said order is void ab initio and must be vacated and held for naught and the stock returned to the estate to be distributed under the will of the decedent.

The fourth request of the Texas legatee and independent executor is that the appraisal of the stock be vacated and set aside "as manifestly inadequate and made through mistake and without full knowledge of the facts; * * *" This allegation either attacks the Court order approving the election under §10509-89 GC, or, when considered in light of other facts pleaded, constitutes an exception to the inventory and appraisement filed some five months after the approval of such inventory; and, unless the time limit is inapplicable because the administratrix with will annexed has been guilty of "fraud or concealment of assets," this portion of the relief demanded must be denied on the grounds that this document was not filed within the time specified in §10509-59 GC, which provides as follows:

"* * * Exceptions to the inventory and/or year's allowance may be filed at any time prior to five days before the date set for the hearing or the date to which such hearing has

been continued as provided herein, by any person interested in the estate or in any of the property included in the inventory, **but such time limit for the filing of exceptions shall not apply in case of fraud or concealment of assets.** * * *" (Emphasis ours.)

If the attack is made under §10509-89 GC, the applicant's claim is now obsolete since the Court has decided that the order must be vacated on other grounds.

Mr. Atkinson in his application alleges that the administratrix with will annexed knew that three shares of said stock had been sold a short time previously for the sum of $2600.00 or $650.00 per share and that there existed a contract requiring said Corporation to purchase at the time of decedent's death any shares of its stock owned by decedent at 40% of the book value. The application then states that the administratrix "failed to inform the appraisers of this agreement * * *" and this "transaction." In the following paragraph the applicant alleges that on the basis of the non-disclosure of the facts and the refusal to return said stock to the estate the administratrix is guilty of concealment of assets. In his brief at page 15 the applicant in reference to the time limit imposed by §10509-59 GC states:

"We submit that the facts here show both legal fraud and concealment of assets * * *. Regardless of any question of the legality of the contract we feel that its existence should have been made known to the appraisers and that the failure to do so amounted to fraud at law even though the administratrix may not have had any intention to deceit and so not be guilty of fraud in fact."

The appraisal of stock in a closely held corporation is admittedly a difficult task which has always been conducive of litigation; and the process of appraising such assets includes many factors peculiar to each case, all of which must be carefully considered. The items which affect the value of stock are innumerable; indeed as just one exhibit in this case is a pamphlet of eighty-three pages setting up an analysis of the value of the Buckeye stock for tax purposes. In addition the surrounding circumstances in the current market must be considered. The appraisers chosen to value this stock where Mr. Walter H. J. Behm, President of Winters National Bank and Trust Company of Dayton, Ohio, the individual who personally handled the Buckeye account for

twenty-six years and who, prior to the appraisal, had a detailed history of the Corporation prepared; Mr. Clarence H. Gosiger was the second appraiser, a man who for thirty years had sold to and dealt with the tool industry, including the Buckeye Corporation; Mr. Harry P. James, who for many years has represented the Court as its official court appraiser, was the third appraiser. His appraisements have been looked upon with favor by this Court as well as federal and state taxing authorities.

It is contended that the administratrix with will annexed herein, who is not and has not been associated to any extent with the business world, misled these gentlemen, admittedly experts in their fields, as to the value of the stock because she did not disclose to those gentlemen certain facts in addition to the multitude considered. That an inventory and appraisement could be vacated on such a ground would be, to say the least, startling.

No fraud was shown, and whether or not the contract of decedent with the Corporation was legal is not a matter which this Court can pass on under the pleadings and the evidence. The fact is the administratrix with will annexed and the Corporation were advised by counsel, who represented both parties, that said contract was illegal; and the administratrix with will annexed was not required under its terms to exercise the option, and she had no duty to do so; therefore, the disclosure or non-disclosure of it could be nothing more than just another element in the maze of details which could have been considered by the appraisers in evaluating stock in a close corporation. Furthermore, the testimony showed rather conclusively that any exercise of such option would have been detrimental to the corporate entity.

Furthermore, the Court has examined the evidence in light of the recent case of **In Re: Estate of Decker, 50 Abs. 443,** April 17, 1948 issue of Ohio Law Abstract, Court of Appeals of Miami County, and the case of **In Re: Estate of Jones, 23 Oh Ap 74,** and is of the opinion that the methods used in appraising said stock to arrive at market value as of the date of decedent's death were more than adequate in absence of proof of fraud or collusion. The stock sold to Reeves several weeks before decedent's death for $400.00 a share was not an arms length transaction and does not, therefore, affect the value of the stock. All motions by the applicant objecting to hypothetical questions propounded by the administratrix with will annexed to the appraisers during the trial of this cause which were taken under advisement by the Court are overruled.

Applicant's contention as to concealment is absolutely untenable. Two Supreme Court cases, a decision of the Court of Appeals of Franklin County, and an unreported opinion of this Court are sufficient citations to dispose of this contention. See **Goodrich v. Anderson, 136 Oh St 509, 17 O. O. 152; In Re: Estate of Black, 145 Oh St 405, 31 O. O. 31; In Re: Estate of Howard, 79 Oh Ap 203, 34 O. O. 537, 48 Abs 189;** and the Estate of Ella M. Meyer, Case No. 106464, Probate Court of Montgomery County, Ohio. There is absolutely no proof of wrongful or criminal conduct on the part of the accused as it may relate to any of the grounds set forth in §**10506-67 GC.**

In conclusion suffice to say that the Court has examined the record carefully and finds no facts which disclose fraud or concealment of assets; wherefore, the prayer that the inventory and appraisement be set aside and a reappraisement ordered is denied. Since the applicant in his brief does not press the issue of the value of the stock if the Court should decide that the spouse's election to purchase it was void for lack of jurisdiction in the Court to approve the purchase, no further opinion as to this question is deemed necessary.

The fifth request of the applicant is that the administratrix with will annexed should be removed for the following reasons:

(a) "* * * by reason of her concealment of assets of said estate in the form of said written agreement between decedent and the Buckeye Tools Corporation * * *"

(b) "* * * because of her having conveyed away said stock * * *"

(c) "* * * because of the existing and unsettled claims between her and the other legatees * * *"

While the purpose is not made clear in the application, it is alleged that the administratrix with will annexed has failed and neglected to comply with §§**10511-17** and **10511-18 GC.** This seems to be a fourth ground for removal.

Relative to the first ground it is unnecessary to do more than point out that the Court in answer to the preceding question has found that there has been no concealment of assets.

As to the second ground alleged, it must be remembered that the stock was conveyed pursuant to an order of this Court which resulted in this litigation and has become a case of first impression in Ohio if not in the United States, and the applicant has not shown how this action is the foundation for removal of the administratrix.

The third ground is founded in the provisions of §**10509-19 GC** which provide:

"The probate court may remove any executor or administrator if there are unsettled claims or demands existing between him and the estate, which the court thinks may be the sub-. ject of controversy or litigation between him and the estate, or persons interested therein."

The authors' comment following this section in Addams & Hosford Ohio Probate Practice, Third Edition, page 839, is as follows:

"Unsettled demands. It is not every claim that an executor or administrator may have against an estate that will justify his removal, for §§10509-105 to 10509-111 GC, inclusive, fully recognize that such claim may be settled without a removal of the executor or administrator.

"There it is provided that the court must pass upon the claim of an executor or administrator and all interested persons made parties, and the same may be appealed to the court of common pleas by any person who is aggrieved by the decision of the probate court. The law of this state further being, that if the executorr or administrator owed the estate anything, that the same becomes assets in his hands for which he is liable on his bond. As it is never to be presumed that a law is made without purpose, we must conclude therefore that there can exist a condition of affairs over unsettled demands existing between the estate and the executor or administrator which will justify the court in ordering his removal. If there are such claims existing as will prevent a proper administration of the estate, the executor or administrator ought to be removed, but the mere fact of the existence of certain claims will not be sufficient."

The fact alone that there may exist claims between the executor or administrator and the estate does not, solely on that ground or as a matter of law, require the removal of the fiduciary. In Re: Estate of Worthington, 5 N. P. 63, 5 O. D. 524; Fox Exrs. v. Keister, 6 N. P. 377, 9 O. D. 316; Woerner, The American Law of Administration, Third Edition, page 883.

Applying the law to the facts of the instant case, it does not appear nor has it been alleged that there are any claims or debts existing between the administratrix herein and the estate other than those arising out of her rights in her husband's estate. These are not disqualifying factors; otherwise, the same grounds could successfully be asserted in any case where the fiduciary was the relict and would be an im-

mediate cause of removal. In addition, upon the termination of the litigation herein involved, the rights of the widow will be fixed and certain and are not at this time a ground for her removal.

As to the last ground the Court holds that §§10511-17 and 10511-18 GC do not apply to estates being administered originally in Ohio in consequence of probating the will under §§10504-15 and 10504-22 GC and having received her appointment as administratrix with will annexed under §10509-1 GC. Said sections appear in the chapter covering ancillary administration and are procedural statutes governing the duties of such fiduciaries.

The request of the applicant for the removal of Peggy Crone McCombs as administratrix with will annexed is denied.

The sixth matter which is divided in three parts can be disposed of very briefly. The question is set forth in full on page 358, ante. None of these matters except point (c) were set forth in the application. Counsel for the parties covered these items in their respective briefs, but these do not form a part of the pleadings and the evidence submitted is insufficient for the Court to arrive at an opinion. Leave is given the parties to file appropriate proceedings if these matters cannot be resolved without further litigation. As to point (c), Reeves is not a party to this proceeding. The evidence showed that the stock was still in his name. While his testimony indicated clearly that he made no claim to the stock and had purchased it for the decedent with the latter's money, nevertheless a property right is involved; and the holder of the record title is not in court except as a witness. Any order made at this point would be a nullity as against Reeves. Obviously, if Reeves endorses the stock to the administratrix with will annexed, it becomes a part of the assets of the estate and a report of newly discovered assets should be filed. The stock question as here involved was only considered as evidence as it pertained to the appraisal of the other corporate shares or as to the conduct of the administratrix with will annexed in dealing with the stock. As to the latter the inquiry would be whether her conduct in relation to the stock was either wrongful or criminal as it pertains to any issue of concealment of assets. The Court has already passed on both matters. Leave is given the parties to file any apropriate proceeding which future circumstances may warrant. As a matter of comment, it would appear that this matter can be resolved without further litigation. It appears that the stock belonged to the decedent and should be reported as newly discovered

assets if Reeves voluntarily endorses the stock to the administratrix with will annexed.

Counsel may submit an appropriate entry. After carefully considering pro and con the results obtained by the parties to this litigation and in view of the distribution to be made of the estate assets as provided by the will and codicil of the decedent, it is ordered that the costs of this proceeding, including the cost of the transcript ordered by the Court, shall be charged to the estate.